IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **CALVIN L. STALLWORTH**<br>**AIS #0000Z649,** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION: 1:15-cv-309-KD-M** |
| | ) | |
| **TERRY RAYBON** | ) | |
| **Warden, Holman Correctional Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Calvin L. Stallworth is an Alabama prisoner serving a death sentence following his 1998 conviction for two counts of capital murder. After unsuccessfully pursuing a direct appeal and post-conviction relief in the Alabama state courts, Stallworth petitioned this Court for a Writ of Habeas Corpus by a Person in State Custody Under Death Sentence pursuant to 28 U.S.C. § 2254. His First Amended § 2254 Petition (Doc. 22) is the operative petition before the Court.

On September 27, 2023, the Court issued a Memorandum Opinion and Order dismissing all of Stallworth's claims except for the sole claim that Stallworth is intellectually disabled and his execution would therefore constitute cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution (as applied to Alabama through the Due Process Clause of the Fourteenth Amendment) and Atkins v. Virginia, 536 U.S. 304 (2002). (Doc. 48). [1] As explained in the Court's prior ruling, the Alabama Court of Criminal Appeals' rejection of Stallworth's intellectual disability claim was unreasonable under 28 U.S.C. § 2254(d). (Doc. 48 at

---

[1] The opinion was issued by Senior Judge Callie S. Granade.  The case was then transferred to the undersigned.

185). Accordingly, the Court is "unconstrained by § 2254(d)'s deference and must undertake a de novo review of the record." Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1260 (11th Cir. 2016). The Court conducted an evidentiary hearing on December 2, 2024.

## I.    **DISCUSSION**[2]

Stallworth contends he is ineligible for the death penalty because he is intellectually disabled. (Doc. 22 at 86). To prove he is intellectual disabled under Alabama law, Stallworth must show: (1) that he has significantly subaverage intellectual functioning (IQ of 70 or below), (2) that he has significant deficits in adaptive functioning, and (3) that those problems manifested before he reached the age of 18. Ferguson v. Comm'r, Ala. Dep't of Corr., 69 F.4th 1243, 1251 (11th Cir. 2023), cert. denied sub nom. Ferguson v. Hamm, 144 S. Ct. 815, 218 L. Ed. 2d 27 (2024) (citing Smith v. State, 213 So. 3d 239, 248 (Ala. 2007)).[3] Stallworth bears the burden of proving by a preponderance of the evidence that he meets these requirements. See Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1345 (11th Cir. 2023) (citing Smith, 213 So. 3d at 252).

---

[2] The factual background and procedural history of Stallworth's case, as well as the legal standard governing his habeas claims, are set forth in detail in this Court's prior Memorandum Opinion and Order. (Doc. 48). Familiarity with that ruling is presumed for purposes of this Memorandum Opinion and Order

[3] The Atkins court left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Atkins, 536 U.S. at 317. Alabama laid out its judicial definition of intellectual disability in Ex Parte Perkins, 851 So. 2d 453 (Ala. 2002), and formally adopted that definition in Smith, 213 So. 3d at 248, a definition the Eleventh Circuit Court of Appeals has accepted. See Ferguson, 69 F.4th at 1254; Jenkins v. Comm'r, Ala. Dep't of Corr., 963 F. 3d 1248, 1275 (11th Cir. 2020), cert. denied, Jenkins v. Dunn, --- U.S. ----, 141 S. Ct. 2635, 209 L. Ed. 2d 758 (2021).

A.  Evidence of Stallworth's Intellectual Functioning[4]

The first component of intellectual disability is "significantly subaverage intellectual functioning (an IQ of 70 or below)." Jenkins v. Comm'r, Ala. Dep't of Corr., 963 F. 3d 1248, 1274 (11th Cir. 2020) (quoting Perkins, 851 So. 2d at 456). This inquiry centers on an individual's IQ, but because IQ testing is inherently imprecise, other factors must be considered. The Eleventh Circuit recently explained the issue:

> Whether [a defendant] has significantly subaverage intellectual functioning turns on whether he has an IQ equal to or less than 70. But the medical community recognizes that the IQ test is imprecise. Each IQ test score has a "standard error of measurement." The standard error of measurement accounts for a margin of error both below and above the IQ test-taker's score. The standard error of measurement thus allows clinicians to calculate a range within which one may say an individual's true IQ score lies.
>
> For that reason, the intellectual functioning inquiry must recognize that an IQ test score represents a range rather than a fixed number. So when the lower end of that range is equal to or less than 70, an offender must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.

Smith, 67 F.4th at 1345 (internal citations and quotation marks omitted).

In Hall v. Florida, 572 U.S. 701(2014), the Supreme Court explained the concept of the "standard error of measurement" or "SEM" in detail:

> Each IQ test has a "standard error of measurement," ibid., often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014) (identifying the SEM as "one of the most important concepts in

---

[4] The IQ Scores of Stallworth:

| Test Date | IQ Test Given | Full Scale Score | 2 SEM(95% confidence) |
|---|---|---|---|
| 1982 | WISC-R | 84 | 79-89 |
| 1986 | WISC-R | 80 | 75-80 |
| 1998 | WAIS-R | 77 | 72-82 |
| 1998 | WAIS-R | 78(verbal only) | |
| 2014 | SB-5 | 72 | 67-77 |
| 2024 | SB-5 | 60 | 55-65 |
| 2024 | WAIS-IV | 65 | 60-70 |

measurement theory"). An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing. <u>See</u> American Association on Intellectual and Developmental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (hereinafter AAIDD Manual); A. Kaufman, IQ Testing 101, pp. 138–139 (2009).

The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. <u>See</u> APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence level that the measured score is within a broader range"). A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM–5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points).... [T]his involves a score of 65–75 (70 ± 5)"); APA Brief 23 ("For example, the average SEM for the WAIS–IV is 2.16 IQ test points and the average SEM for the Stanford–Binet is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error)"). Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. <u>See</u> Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289–291, 318 (D. Saklofske, C. Reynolds, V. Schwean, eds. 2013). In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

Hall at 713–14.

To satisfy the first prong of the <u>Atkins</u> test, Stallworth called Dr. Glen King as an expert witness to testify regarding the results and interpretation of Stallworth's IQ and adaptive functioning tests administered by Dr. King in 2024. Dr. King is a clinical and forensic

psychologist and attorney licensed in Alabama.[5] Previously, Dr. King served as a certified forensic examiner for the Alabama State Department of Mental Health from 1992 until 2017. Dr. King is currently contracted by the Alabama Attorney General's Office to perform psychological testing and has been conducting these evaluations for them for over 30 years. Dr. King has also performed psychological evaluations for the Georgia Attorney General's Office. The psychological evaluations Dr. King normally conducts for the Attorney Generals' Offices are postconviction evaluations for issues in death penalty cases including intellectual disability. Dr. King estimates that he has administered approximately one hundred (100) evaluations for the Attorney Generals' Office. Out of the one hundred (100) evaluations, he found an unfavorable result to the Attorney General's position approximately ten (10) times.

This case is one of those instances. Dr. King's testing supports an unfavorable finding for the Attorney General's Office who hired him to do the testing. Thereafter, the Attorney General's Office rejected his conclusion and attempted at the evidentiary hearing to discredit his opinion. The Attorney General's Office did not present another expert witness to counter or rebut Dr. King's testimony but rather relied on the evidence in the record.

In an effort to determine Stallworth's intellectual functioning, Dr. King administered to Stallworth the Stanford Binet Intelligence Scales, Fifth Edition (SB-5), Wechsler Adult Intelligence Scale-IV (WAIS-IV), and Wide Range Achievement Test, Fifth Edition (WRAT-5). (Id. at 51) Dr. King described the SB-5 and WAIS-IV tests as the gold standard of IQ testing. (Id.). Stallworth scored a Full Scale Score of 60 on the SB-5, which would have a range of 57-65

---

[5] Dr. King earned his Master of Science Degree and Doctoral Degree in clinical psychology from Florida State University and his Juris Doctorate degree from Jones School of Law at Faulkner University in 1999. (Doc. 75 at 45-46).

accounting for the 2 SEM.[6] (Doc. 66-1 at 6). This score places Stallworth in the .4 percentile. (Id.) On the WAIS-IV, Stallworth received a Full Scale Score of 65, and accounting for the 2 SEM would place the range of this score at 62-70 and in the one percentile rank. (Id. at 7) And although Dr. King did not test for malingering, Dr. King stated he saw no evidence of Stallworth malingering throughout the testing. (Doc. 75 at 57).

Dr. King also addressed Stallworth's previous IQ scores from Foley Middle School in 1982 and Baldwin County Schools in 1986, Dr. John W. Davis's testing in 1998, Dr. Robert DeFrancisco's competency testing in 1998[7], and Dr. Karen Salekin's testing in 2014. As to the IQ testing administered at Foley Middle School in 1982 and at Baldwin County Schools in 1986, Dr. King testified that he does not trust this testing because the data were inconsistent and outdated. Specifically, Dr. King testified that there were "mental age" listings to the side of the actual IQ scores and that mental age has not been a utilized tool in IQ tests for around 70 years. Moreover, the actual IQ scores of the two sets of testing and the mental ages listed on each test are contradictory to one another. For example, Dr. King testified that on an IQ test given to Stallworth at age 16 his mental age was listed as 12 years old, which would be an equivalent to an IQ score of 71. But the IQ score from this test was 80. Because of these inconsistencies, Dr. King does not believe these tests results are reliable.

---

[6] The Court has relied on the 2 SEM scoring range which provides for a statistical confidence level of 95%. To rely on a lesser confidence level in a matter of a person's life is unreasonable in the opinion of the undersigned.

[7] Dr. Robert DeFrancisco conducted a psychological evaluation on Stallworth before his trial, but Dr. DeFrancisco's evaluation was to determine Stallworth's competency to stand trial. Here, the determination is on Stallworth's culpability, not competency. See Atkins, 536 U.S. at 318. Further, Dr. King testified that Dr. DeFrancisco's testing is not reliable for determining intellectual disability as he only conducted the verbal portion of the WAIS-R IQ test. (Doc. 75 at 59-60). Because Dr. DeFrancisco's testing is only partial, the Court finds it is not a reliable gauge to determine Stallworth's intellectual functioning.

Further, Dr. King pointed out the thoroughness of the testing and the expertise of the test administrators in 1982 and 1986 is unknown. Each examiner signed as a Psychometrist. Dr. King took issue with whether a psychometrist was qualified to administer and interpret IQ scores for purposes of determining whether a person is considered legally and medically intellectually disabled, as opposed for educational placement purposes. Dr. King is not alone in this opinion. In the context of Social Security Benefits, some courts agree. See, <u>Giles ex rel. Dowdell v. Barnhart</u>, 182 F. Supp. 2d 1195, 1199 (M.D. Ala. 2002) (The court finds that it was reasonable for the ALJ to place less weight on the results of the claimant's October 1997 WISC–III test because it was not administered by an acceptable medical source.) And in support of Dr. King's opinion, the National Association of Psychometrists recognizes the requirement that psychometrist be supervised by a psychologist. See https://napnet.org/what (last visited January 14, 2025) ("A psychometrist is responsible for the administration and scoring of psychological and neuropsychological tests under the supervision of a clinical psychologist or clinical neuropsychologist.") Upon consideration, and reliance on Dr. King's opinion, the Court finds that the IQ tests administered in 1982 and 1986 are not reliable evidence of Stallworth's IQ.

This leaves only one IQ score (out of 4) that places Stallworth outside the subaverage intellectual functioning range after applying 2 SEM: the test administered by Dr. Davis in 1998. Dr. Davis administered several tests to Stallworth including the Wechsler Adult Intelligence Scale-Revised (WAIS-R). On these tests Stallworth received a score of 77 on the WAIS-R. The range of this score applying the 2 SEM is 72-82. This score places Stallworth in the borderline intellectually disabled range.

The remaining three IQ tests in the record were administered by Dr. Karen Salekin and Dr. King. Dr. Karen Salekin evaluated Stallworth in 2014 by administering the Stanford-Binet

Intelligence Scales, Fifth Edition (SB-5). Stallworth scored a Full-Scale Score of 72 (2014) which classifies him as borderline intellectually disabled. The range of the score with the 2 SEM is 67-79 which means that Stallworth falls within the possible range of subaverage intellectual functioning. As noted, Dr. King's testing found that Stallworth had a SEM adjusted IQ of between 55-70 and thus had subaverage intellectual functioning.

Dr. King did not take issue with either Dr. Davis' or Dr. Salekin's testing. Rather he found their testing to be consistent with his testing, noting that his experience has shown that IQ scores in the lower ranges change very little over time.

The State urges the Court to reject the opinion of Dr. King on the basis that Stallworth had reason to malinger on the tests administered by Dr. King and Dr. Salekin. The State also indicates that Dr. King's opinion should not be credited since he did not test for malingering. This argument seems to ignore Dr. King's vast experience, most often on behalf of the State, with testing individuals accused of crimes that might benefit from deflated scores or a false diagnosis.[8]

In contrast to the State's speculation as to the accuracy of Dr. King's testing, Dr. King has demonstrated expertise as a scholar and an expert in his fields. Specifically, he has conducted approximately one hundred post-trial IQ evaluations as an expert for the Alabama and Georgia Attorney Generals' Office. Dr. King is highly experienced and a credible expert, as evidenced by his approximately 25 year-long contract with the Alabama Attorney General's Office. Also, Dr. King's testing is supported by Dr. Salakin's testing. And as explained below, even Dr. Davis'

---

[8] Dr. King has performed over eight thousand (8000) mental evaluations on criminal defendants for purposes of determining whether they were mentally ill at the time of the offense. In ninety-two percent (92%) of the cases Dr. King determined that the defendant was not suffering from a mental illness or defect which would render him/her incompetent at the time of the offense. See, Travis v. Hamm, No. 24-206-KD-B (S.D. Ala. filed June 21, 2024), Doc. 2-58 at 38–39. In other words, Dr. King most often agrees with the State.

evaluation supports Dr. King's ultimate findings.  Accordingly, the Court finds that Dr. King's evaluation of Stallworth's intellectual functioning is the most reliable evidence of record. Therefore, Stallworth satisfies the first <u>Atkins</u> prong of having significant subaverage intellectual functioning.[9]

B.  <u>Stallworth's Adaptive Functioning</u>

The second component of intellectual disability is "significant or substantial deficits in adaptive behavior." <u>Smith</u>, 67 F.4th at 1349 (citing <u>Perkins</u>, 851 So. 2d at 456). Broadly, this component requires the Court to examine "how well [Stallworth] meets community standards of personal independence and social responsibility, in comparison to others of similar age and social background." <u>Id.</u> (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders at 37 (5th ed. 2013) (hereinafter DSM-5; Am. Ass'n on Intell. & Dev. Disabilities, Intellectual Disability: Definition, Classification, and Systems of Support at 29 (12th ed. 2021) (hereinafter AAIDD-12)). More specifically, the adaptive-functioning prong looks at whether Stallworth has deficits in any of these three domains: conceptual, social, or practical. <u>Id.</u> at 1349-50 (citing <u>Moore v. Texas</u>, 581 U.S. 1, 15–16 (2017); DSM-5 at 38 (explaining that the adaptive-functioning criterion "is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired" such that "ongoing support" is necessary "for the person to perform adequately in one or more life settings at school, at work, at home, or in the community"); AAIDD-12, at 31 (explaining that "the 'significant limitations in adaptive behavior'

---

[9] Dr. King provided testimony regarding why he does not adhere to the Flynn Effect in his testing. Dr. King stated that the Flynn Effect is not used in testing in any other context other than death penalty cases. Dr. King also provided evidence of the faultiness of the Flynn Effect by providing information from an article authored by James Flynn, the creator of the Flynn Effect, where the author calls into question the Effect. Flynn, James R., *Reflections about intelligence over 40 years*. INTELLIGENCE 70 (2018). Based on this testimony, the Court declines to adjust the IQ scores based on the Flynn Effect.

criterion" requires "an adaptive behavior score that is approximately 2 standard deviations or more below the mean in at least one of the three adaptive behavior domains, conceptual, social, or practical"). Under Atkins, "the adaptive-skill component of intellectual disability requires substantial present limitation in at least two of the following areas: 'communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.'" Jenkins, 963 F.3d at 1277 (quoting Atkins, 536 U.S. at 308 n. 3).

Moreover, the Court cannot weigh petitioner's adaptive strengths against his established adaptive deficits. The Court only looks to whether the petitioner has established by reliable evidence that one domain of adaptive functioning is sufficiently impaired. As explained in Smith v. Comm'r, Alabama Dep't of Corr., 924 F.3d 1330, 1343 (11th Cir. 2019):

> After *Moore v. Texas*, it is abundantly clear that states may not weigh a defendant's adaptive strengths against his adaptive deficits. Doing so contradicts the medical community's current clinical standards. *Moore*, 137 S. Ct. at 1050–51. As the Supreme Court explained in *Moore*, many individuals with intellectual disabilities have both adaptive deficits and adaptive strengths, and "significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." *Id.* at 1050 (citation omitted). Alabama argues that the state court did not weigh Smith's adaptive strengths against his adaptive deficits. We firmly disagree. Despite concluding that Smith "showed deficits in adaptive functioning based upon test results," the state court considered other factors that weighed against "an overall finding of deficiency," treating the adaptive functioning prong like a balancing test. In particular, the state court considered Smith's ability to conceal his crime, ability to take care of his mother, and his scores on certain mathematics and reading tests as adaptive strengths that outweighed his apparent deficits. This approach was acceptable at the time. But after *Moore*, it no longer is.

Stallworth presented three lay witnesses at the Atkins hearing that testified to his adaptive functioning. Two witnesses testified to his adaptive behavior after the age of 18 and one witness testified to his adaptive functioning before the age of 18. The first witness to testify to his adaptive functioning after the age of 18 was Stephanie Rollin. Stephanie Rollin was Stallworth's girlfriend

for approximately two years starting when she was 15 years old, and Stallworth was 18 years old. Rollin said that during their relationship, Stallworth was not regularly employed, did not have a driver's license and did not know his own birthday. Rollin testified that Stallworth lived with his mother, her husband and his siblings in a two-bedroom trailer and did not believe this to be a supportive environment. When asked specific questions regarding Stallworth's ability to function in society, Rollin did not provide any helpful information.

The second witness to Stallworth's adaptive behavior (after the age of 18) was Stephanie Rollins' mother Cynthia Lauing. Lauing met Stallworth when he began spending time with her daughter. Lauing stated that she did not develop a relationship with Stallworth until three years into his incarceration when they began to talk on the phone (Stallworth would have been approximately 30 years old). On their phone calls, Stallworth would tell Lauing stories and Lauing testified that his stories were often not sequenced, like the storytelling of a nine- or ten-year-old. Lauing also testified that Stallworth was very vulnerable which resulted in people taking advantage of him. No other helpful evidence on the issue of Stallworth's adaptive functioning was elicited from this witness.

The only witness to testify at the <u>Atkins</u> hearing on Stallworth's adaptive functioning before the age of 18 was his special education teacher at Foley High School Dr. Michael Merold. Dr. Merold received his undergraduate and master's degrees in Special Education, an educational specialist degree in Special Education and his doctorate degree in Curriculum Instruction. Dr. Merold began teaching special education classes for the emotionally disturbed at Foley High School in 1986. Dr. Merold classes consisted of seven or eight students, one of which was Stallworth.

11

Dr. Merold defined emotionally disturbed students as students who have behavioral issues that hinder their ability to learn. Dr. Merold testified that Stallworth was placed in this class because his emotional disturbance was more prevalent than his learning disability. The emotionally disturbed students were taught by Dr. Merold for most of the day. Dr. Merold taught Stallworth for about three years, before Stallworth stopped attending school at the age of 18. Dr. Merold testified that Stallworth was not aggressive, nor did he exhibit behavioral issues in his class. Dr. Merold described Stallworth as compliant, but with severe deficits in reading and math such that he could not function in a regular classroom. Dr. Merold also noted that Stallworth did not pick up on normal social cues, wore dirty clothes, did not bath regularly, and could not see the consequences of his actions. According to Dr. Merold, these attributes necessitated a structured environment for Stallworth. In other words, Stallworth had deficits in self-care and self-direction.

In response to questioning as to why Stallworth was in a class for the emotionally disturbed as opposed to a class for the learning disabled, Dr. Merold explained that to be learning disabled a student must be of average or above average intelligence. In other words, a learning-disabled student is capable of improvement. Dr. Merold believed that Stallworth did not fall into that category and was thus placed in the emotional disturbance class. Dr. Merold also testified if a student had an IQ of 80, which was Stallworth's IQ score from Baldwin County Schools, the student could improve academically after intensive intervention. However, Stallworth was not capable of achieving that. In sum, Dr. Merold testimony supports a finding that Stallworth suffered from significant intellectual disabilities and deficits in adaptive functioning prior to the age of 18.

As discussed above, Dr. Davis evaluated Stallworth when Stallworth was 27 years old. The purpose of the evaluation was to determine whether Stallworth's statement to police was knowing and voluntary. Dr. Davis noted that Stallworth had no language impairments, had worked in

landscaping, but had no driver's license. Dr. Davis also noted that Stallworth has "marked dependency needs", was in special education classes and dropped out of school around the tenth grade. (Doc. 68-1, p. 21) At a pre-trial hearing, Dr. Davis testified that Stallworth "is a dependent man, looks to others for guidance and direction, that he needs a structured environment, one where other people are planning daily activities for him." (Doc. 20-18, p. 188).

To evaluate Stallworth's adaptive functioning, Dr. King administered two adaptive behavior tests to Stallworth – Adaptive Behavior Assessment System Third Edition (ABAS-3) and the Independent Living Scales (ILS). Usually the ABAS-3 can be self-administered, but Dr. King testified that Stallworth was unable to self-administer this test as his reading comprehension level was below a 6th grade level.

Stallworth received a 70 on his General Adaptive Composite Score of the ABAS-3. Dr. King testified that when one or more scores for adaptive behavior is below 70 on the ABAS-3 it is indicative of low functioning. Stallworth received a score of 68 on the Conceptual subsection of the ABAS-3, a score of 77 on the Social subsection, and a score of 72 on the Practical subsection of the ABAS-3. In addition, Dr. King noted that Stallworth's scores on Community use of resources, functional academics and Health and Safety were 3 and below. According to Dr. King, these scores indicate significantly impaired adaptive functioning. In sum, Dr. King testified that Stallworth's scores on the ABAS-3 corroborated the low intellectual functioning as shown by his IQ scores.

The ILS adaptive behavior test tests practical skills. Stallworth's Full Scale Standard Score on the ILS was a 55, which is the lowest score one could receive on the ILS. On six out of seven areas, Stallworth received a score categorized as "extremely low," and on the other area, his score was classified as "low." In his report and testimony Dr. King opined that Stallworth was unable

to fill out a check, address an envelope, give the address of where he had been living for the last twenty-five years, explain what social security benefits are, do simple math, use a phonebook, tell him what health insurance provided, or use an ATM; all indicative of low functioning in the areas of functional academics and use of community resources.  As to health and safety, Dr. King noted that Stallworth's responses indicated that he would not know how to safely handle a late-night visit to his home, know the signal that it is safe to walk across the street, or respond appropriately to a gas leak.

The issue of Stallworth's scores on the ABAS-3 and the ILS is whether they paint a true picture of his adaptive functioning. The State asserts that Stalworth could have been malingering. Dr. King addressed the issue of malingering and stated that Stallworth's performances on the tests were consistent, and that Stallworth would directly answer simple questions. Dr. King did not administer a test to determine malingering, but based on Dr. King's experience with criminal defendants, he did not suspect that Stallworth was malingering. Dr. King's opined that Stallworth's adaptive functioning was extremely poor and that he functions in the mild range of intellectual disability.

The State argues otherwise.[10]  In support, the State points to evidence that shows Stallworth was capable of providing support to his family by means of working (in menial jobs like lawncare and cleaning), having an apartment (no indication who obtained the apartment), paying bills (by taking cash to the utility company) and shopping at Walmart with stolen money.  The State also notes that Stallworth stated he read the Bible, bought a car from a neighbor (but didn't register it

---

[10] The undersigned was not the judge that initially reviewed the record or issued the 194-page opinion addressing all of Stallworth's claims.  Thus, the Court requested that the State file a post hearing brief that pointed to all the evidence in the record that supported their position that Stallworth's adaptive functioning was not sufficiently impaired.

or have a driver's license) and that his past behavior shows he is savvy enough to try to "cover his tracks" and avoid punishment. The State then points to over three hundred (300) pages of Stallworth's testimony at trial alleging that Stallworth was able to spar with a seasoned prosecutor.

Whether Stallworth's adaptive functioning supports his contention that he is intellectually disabled is a close question and admittedly the evidence is limited. On the one hand, you have an experienced expert who has met Stallworth, evaluated Stallworth and readily determined that he is intellectually disabled. And this is not an expert hired by Stallworth's defense. Dr. King, an expert hired by the State, has conducted over 8,000 evaluations of criminal defendants. His expertise and track record would indicate that he is not readily fooled by a person facing criminal charges who may have the motive to fake mental issues or functioning.[11] And his opinion is

---

[11] Below is a sampling of federal cases where Dr. King's evaluation was considered:

- Reeves v. Comm'r, Alabama Dep't of Corr., 836 F. App'x 733 (11th Cir. 2020), cert. granted, judgment rev'd sub nom. Dunn v. Reeves, 594 U.S. 731 (2021). – Dr. King found that Reeves was borderline intellectually disabled as he had an IQ score of 68 and tested low in some adaptive functioning areas. However, it was ultimately Dr. King's opinion that Reeves did not have substantial deficiencies in these areas. The Court found Dr. King's testimony credible.
- Smith v. Dunn, 2021 WL 3666808 (S.D. Ala. Aug. 17, 2021), order clarified on reconsideration, 2021 WL 5656464 (S.D. Ala. Nov. 30, 2021), and aff'd sub nom. Smith v. Comm'r, Alabama Dep't of Corr., 67 F.4th 1335 (11th Cir. 2023), cert. granted, judgment vacated sub nom. Hamm v. Smith, 604 U.S. 1 (2024) – Dr. King found Smith had a borderline IQ score, no low adaptive scores and no evidence of intellectual defect before 18. However, the District Court ruled that Smith was intellectually disabled. This opinion was affirmed on appeal but vacated by the Supreme Court and remanded for further proceedings.
- Smith v. Comm'r, Alabama Dep't of Corr., 924 F.3d 1330 (11th Cir. 2019) – Dr. King and Dr. Salekin had inconsistent scoring wherein Dr. King determined, contrary to Dr. Salekin, that Smith was not intellectually disabled.
- Clemons v. Comm'r, Alabama Dep't of Corr., 967 F.3d 1231 (11th Cir. 2020) – Dr. King opined that Clemons low IQ scores were the result of malingering. (District Court Case cite: Clemons v. Thomas, 2016 WL 1180113 (N.D. Ala. Mar. 28, 2016).)
- Thompson v. Hamm, 2024 WL 3564572 (N.D. Ala. July 8, 2024), report and recommendation adopted, 2024 WL 3553844 (N.D. Ala. July 26, 2024) – Dr. King found Thompson was intellectually disabled and the State concurred in this determination.

supported Dr. Merold's and Dr. Davis' observations; both testified that Stallworth required a very structured environment to function.

On the other hand, you have the State piecing together bits of evidence in the record to argue that the Court should reject Dr. King's opinion because Stallworth must have been malingering. At the hearing and then to a lesser extent in the post-trial brief, the State would have the Court believe that Stallworth is a "mastermind" criminal who is capable of sparring with a seasoned prosecutor. However, a review of the transcript doesn't support this exaggerated claim. The transcript indicates that Stallworth's testimony consists of repeated denials of guilt and repeated claims that he was threatened to confess. And the fact that his verbal skills may appear to be higher than an intellectually disabled person is not surprising since the IQ testing consistently shows a higher verbal IQ than nonverbal IQ. However, as the Supreme Court explained in Moore, an individual with an intellectual disability may have adaptive strengths, but "significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." Id. at 1050.

---

- Samra v. Warden, Donaldson Corr. Facility, 626 F. App'x 227 (11th Cir. 2015) – Dr. King found Samra had borderline range of intellectual ability but that this impairment did not impact Samra's ability to appreciate the criminality of his conduct.
- Tarver v. Thomas, 2012 WL 4461710 (S.D. Ala. Sept. 24, 2012) – Dr. King found Tarver intellectually disabled. The District Court concurred with Dr. King and found that the State Court's determination otherwise was unreasonable.
- Tharpe v. Warden, 834 F.3d 1323 (11th Cir. 2016) – Dr. King found that Tharpe was not intellectually disabled. The Eleventh Circuit upheld the rejection of Tharpe's claim that he was intellectually disabled.
- Morris v. Mitchell, 2024 WL 3800386 (N.D. Ala. Aug. 13, 2024) – Dr King determined that Morris functions in the high borderline to low average range of intellect despite an IQ score of 41. Dr. King attributed the low IQ score to malingering.
- Davis v. Allen, 2016 WL 3014784 (N.D. Ala. May 26, 2016) (affirmed by 11th Cir. Davis v. Comm'r, Alabama Dep't of Corr., 120 F.4th 768 (11th Cir. 2024) – Dr. King found Davis had borderline intellectual functioning.

Considering the totality of the evidence and crediting Dr. King's testimony, the Court finds that Stallworth has proven by a preponderance of the evidence that he has significant deficits in adaptive functioning.

C.  Evidence of Stallworth's Developmental Period

The third and final component of intellectual disability is that the first two components—a defendant's subaverage intellectual functioning and his adaptive-skill deficits—manifested "before the defendant reached age 18." Jenkins, 963 F. 3d at 1278 (quoting Perkins, 851 So. 2d at 456).  The only reliable evidence of record regarding Stallworth's functional abilities before the age of 18 was Dr. Merold.  Dr. Merold testified that Stallworth did not attend to self-care and needed a structured environment to function.  Dr. King asserts that Merold's testimony and the fact that Stallworth dropped out of school in the 9th grade, supports his determination that Stallworth subaverage intellectual functioning was present before the age of 18.  Moreover, Dr. King explained that his experience has shown that IQ scores in the lower ranges change very little over time

The State relies on the testing of Stallworth in 1982 and 1986 to argue otherwise. However, the Court credits Dr. King's determination that neither of these two tests are reliable evidence of Stallworth's intellectual functioning or adaptive functioning prior to the age of 18.

Upon consideration of the limited evidence before this Court and crediting the expertise of Dr. King, the Court finds that Stallworth has established by a preponderance of the evidence that his deficits in adaptive behavior manifested before the age of 18.

## II.    <u>CONCLUSION</u>

The Court concludes that Stallworth is entitled to § 2254 relief based on his <u>Atkins</u> claim that he is intellectually disabled. Accordingly, Stallworth's petition for writ of habeas corpus is **GRANTED**, and his death sentence is **VACATED**.

DONE and ORDERED this the **16th day** of **January, 2025.**

<u>s/ Kristi K. DuBose</u>
UNITED STATES DISTRICT JUDGE